**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**
_____

**JOHANNA BETH McDONOUGH,**
*Plaintiff-Appellant*,


vs.


**ANOKA COUNTY, ET AL.**
*Defendants-Appellees*.
_____


On Appeal from the
United States District Court for the District of Minnesota
Case No. 0:13-cv-01889 (DSD/FLN)
_____


**BRIEF OF PLAINTIFF-APPELLANT JOHANNA BETH McDONOUGH**
_____

Jonathan A. Strauss (#0279602)
Sonia Miller-Van Oort, #278087
Lorenz F. Fett (#196769)
Kenn H. Fukuda, #389301
12 South Sixth Street, Suite 1242
Minneapolis, MN 55402
Telephone: 612.756.7100
Email: jons@sapientialaw.com
Email: soniamv@sapientialaw.com
Email: larryf@sapientialaw.com
Email: kennf@sapientialaw.com

*Attorneys for Plaintiff-Appellant*

i

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Appellant ("McDonough") provided her personal information to Appellee Commissioners ("Commissioners") when seeking her driver's license. Law enforcement officers from several agencies ("Municipalities") used the state database to retrieve McDonough's personal information nearly 500 times. These accesses were not done to carry out any law enforcement function and violated the Driver's Privacy Protection Act, 18 U.S.C. §2721 et. seq. ("DPPA").

In these issues of first impression, McDonough seeks reversal of the District Court's application of the DPPA in three respects. First, this Court should determine that McDonough met the *Iqbal* and *Twombly* pleading requirements and sufficiently pled a plausible DPPA claim. Second, this Court should hold that the DPPA's four-year statute of limitations under 28 U.S.C. § 1658(a) is governed by the discovery rule. And third, this Court should hold that Commissioners may be liable under the DPPA for granting access to driver's personal information without ascertaining whether the user has a *purpose* permitted under the DPPA to obtain it.

The legal issues in this case are essentially identical to those in three other contemporaneous appeals 14-1756, 14-1765, and 14-1974. Appellants in each (all represented by the same counsel) ask that these four cases be consolidated for oral argument. McDonough requests 60 minutes to argue all four appeals at the same time, with two of Appellant's attorneys splitting up the issues for oral argument.

ii

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT .......... ii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES ........................................................2

STATEMENT OF THE CASE AND FACTS .................................. 7

    I.    MCDONOUGH IS A KNOWN AND RECOGNIZABLE
        PERSON IN HER COMMUNITY ...........................................8

    II.   MCDONOUGH PROVIDED HER PERSONAL INFORMATION TO
        COMMISSIONERS ................................................................ 8

    III.  LAW ENFORCEMENT OFFICERS MADE STRAY COMMENTS TO
        MCDONOUGH IN THE PAST THAT DID NOT MAKE SENSE TO
        HER AT THE TIME, BUT NOW APPEAR TO RELATE TO THE
        ISSUES IN THIS CASE ........................................................ 9

    IV.  MCDONOUGH'S INFORMATION WAS ILLEGALLY
        OBTAINED ..........................................................................10

    V.   MUNICIPALITIES ACTIVELY CONCEALED INFORMATION
        RELATING TO THEIR ILLEGAL ACCESSES ...................13

SUMMARY OF THE ARGUMENT ................................................16

STANDARD OF REVIEW ................................................................19

    I.    THE DISTRICT COURT ERRED WHEN FINDING
        MCDONOUGH'S DPPA CLAIM NOT PLAUSIBLE…… ...................20

        A.    Municipalities Must Have a Permissible Purpose to Lawfully
             Access Anyone's Personal Information…………………………20

B.     McDonough's Allegations Specifically Allege that Municipalities Obtained Her Private Data For a Purpose Not Permitted. .............25

C.     The Pleading Burden Proposed by the District Court Unfairly Presents a Different Standard Because Law Enforcement is Involved. ................................................28

D.     The District Court Relied on Inapposite Cases to Reach its Conclusion................................................29

E.     McDonough's Complaint is Plausible ............................................32

II.     THE DPPA'S STATUTE OF LIMITATIONS SHOULD BE GOVERNED BY THE DISCOVERY RULE........................................34

A.     The Default Rule for Statute of Limitations is the Discovery Rule ....................................................34

B.     Congress Never Intended to Modify §1658(a)'s Application of the Discovery Rule With the Inclusion of §1658(b) ...................................................40

C.     Public Policy Supports the Applicability Of the Discovery Rule ....................................................45

III.     COMMISSIONERS SHOULD BE LIABLE FOR THEIR DISCLOSURE OF MCDONOUGH'S PRIVATE DATA .....................51

A.     Congress Intended for State Officials to Have Responsibilities Under the DPPA for Which They Would be Accountable and Liable. ...............................52

B.     Both the Statutory Construction of §2721, as Well as Directly Relevant DPPA Case Law, Support this Court's Interpretation that "Knowingly" Modifies Only Disclosure. .......55

C.     This Court has Interpreted "Knowingly" to Modify Only the Act Requirement (Not the Purpose Requirement) in a Similarly Worded Statute..................................................58

iv

D.     Regardless of the "Knowingly" Issue, Commissioners are Liable
       Under the DPPA, Because they Knew the System they Established
       Never Required an Ascertainment of Purpose ............................59

CONCLUSION ......................................................................................63

Appellate Case: 14-1754     Page: 5     Date Filed: 05/28/2014 Entry ID: 4158496

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Adams v. Woods*, 2 Cranch 336 (1805) ................................................................ 36

*Amy v. City of Watertown*, 130 U.S. 320 (1889) .................................................. 45

*Andersen v. U.S. Dept. of Housing and Urban Dev.*, 678 F.3d
    626 (8th Cir. 2012) ........................................................................................ 34

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 19

*Bailey v. Glover*, 88 U.S. 342 (1874) ................................................................... 46

*Batson v. Kentucky*, 476 U.S. 79 (1986) .............................................................. 25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................ *passim*

*Best v. Berard*, 837 F. Supp. 2d 933 (N.D. Ill. 2011) .......................................... 57

*Braden v. Wal-Mart Stores*, 588 F.3d 585 (8th Cir. 2009) .................................. 19

*Carsanaro v. Bloodhound Techs., Inc.*, 2013 WL 1104901
    (Del. CH. Mar. 15, 2013) ............................................................................... 37

*Chang v. Baxter Healthcare Corp.*, 599 F.3d 718 (7th Cir. 2010) ................ 43, 47

*Clement v. United Homes, LLC*, 2012 WL 6720701
    (E.D.N.Y. Dec. 27, 2012) .............................................................................. 47

*Comcast of Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d
    938 (8th Cir. 2007) ................................................................................. *passim*

*Commissioner v. Clark,* 489 U.S. 726 (1989) ...................................................... 23

*Cook v. ACS*, 663 F.3d 989 (8th Cir. 2011) ......................................................... 63

*Dique v. New Jersey State Police*, 603 F.3d 181 (3d Cir. 2010) .......................... 35

Appellate Case: 14-1754    Page: 6    Date Filed: 05/28/2014 Entry ID: 4158496

*Disabled in Action of Penn. v. Se. Penn. Trans. Auth.*, 539 F.3d 199 (3rd Cir. 2008)............................................................................35

*Donell v. Mojtahedian*, 2013 WL 5143035 (C.D. Cal. Sept. 12, 2013)................37

*English v. Parker*, 2011 WL 1842890 (M.D.Fla. May 16, 2011) ....................44, 45

*Erickson v. Pardus*, 551 U.S. 89 (2007) ................................................................19

*Fayemi v. Offerman*, 99 Fed. Appx. 480 (4th Cir. 2004)........................................35

*Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222 (1957)....................42

*Gabelli v. SEC*, 133 S.Ct. 1216 (2013)............................................................*passim*

*Gordon v. Softech International*, 2013 WL 3939442 (2nd Cir. Jul. 31, 2013) ................................................................*passim*

*Gracyk v. West Publ. Co*, 660 F.3d 275 (7th Cir. 2011)..........................................63

*Gross v. Max*, 906 F.Supp.2d 802 (N.D. Ind. 2012)..........................................43, 47

*Harman v. Moore*, 547 U.S. 250 (2006)................................................................24

*In re LIBOR-based Fin. Ins. Antitrust Litig.*, 2013 WL 1285338, (S.D.N.Y. Mar. 29, 2013) ................................................................40

*In re Monumental Life Ins. Co.*, *Indus. Life Ins. Litig.*, 365 F.3d 408 (5th Cir. 2004)................................................................35

*In re The City of New York*, 607 F.3d 923 (2d Cir 2010) ........................................30

*In re Weldeabzghi*, 2013 WL 717755 (D. Minn. Feb. 27, 2013) ....................40, 42

*Izaak Walton League of Am. v. Kimberll*, 558 F.3d at 759 (8th Cir. 2009)................................................................40, 47

*Jones v. United States*, 898 F. Supp. 1360 (D. Neb. 1995) ....................................58

Appellate Case: 14-1754    Page: 7    Date Filed: 05/28/2014 Entry ID: 4158496

*Jones v. United States*, 97 F.3d 1121 (8th Cir. 1996) ........................................58, 59

*Loudner v. United States,* 108 F.3d 896 (8th Cir.1997) ...........................................40

*Kansas City, Mo. v. Fed. Pac. Elec. Co.,* 310 F.2d 271 (8th Cir. 1962) .................45

*Koch v. Christie's Int'l PLC*, 699 F.3d 141(2nd Cir. 2012) ....................................40

*Kost v. Hunt,* No. 13-583 (JNE/TNL), 2013 WL 5566045 at *4 (D. Minn. Oct. 8, 2013) ...........................................................................................*passim*

*Kronisch v. U.S.*, 150 F.3d 112 (2d. Cir. 1998) ......................................................48

*Lancaster v. City of Pleasanton*, No. C-12-05267, 2013 WL 5182949 (N.D. Cal. Sept. 13, 2013). ....................................................31, 32

*Mallak v. Aitkin County*, 13-CV-02119 (DFW/LIB) 2014 WL 1285807 (March 31, 2014) ...........................................................................33

*Mangum v. Action Collection Services,* 575 F.3d 935 (9th Cir. 2009).....................35

*Maracich v. Spears,* 133 S.Ct. 2191 (2013).........................................................*passim*

*Maverick Transportation, LLC v. U.S. Department of Labor,* 739 F.3d 1149 (8th Cir. 2014)...................................................................*passim*

*McCann v. Hy-Vee, Inc.*, 663 F.3d 926 (7th Cir. 2011)...........................................42

*McSurely v. McClellan*, 697 F.3d 309 (D.C. Cir. 1982).........................................24

*Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) ....................................................45

*Pichler v. UNITE,* 228 F.R.D. 230 (E.D. Pa. 2005) ...........................................55, 60

*Pichler v. UNITE*, 542 F.2d 380 (3d Cir. 2008), *aff'g* 228 F.R.D. 230 (E.D. Pa. 2005) ...................................................................56

*Rios v. Direct Mail Express, Inc.,* 435 F.Supp.2d 1199 (S.D. Fla. 2006)...................................................................57

Appellate Case: 14-1754    Page: 8    Date Filed: 05/28/2014 Entry ID: 4158496

*Rotella v. Wood*, 528 U.S. 549 (2000) ....................................................34

*Senne v. Village of Pallatine, Illinois,* 695 F.3d 597 (7th Cir. 2012) ...................57

*S.E.C. v. Amerindo Inv. Advisors, Inc*., 2014 WL 405339,
(Feb. 3, 2014)..........................................................................39

*S.E.C. v. Pentagon Capital Management PLC*, 725 F.3d
279 (2d Cir. 2013)......................................................................39

*Smythe v. City of Onamia*, 2013 WL 2443849 ...........................................21, 33, 44

*Taylor v. Acxion Corp.,* 612 F.3d 325 (5th Cir. 2010)....................................20

*Torres Ramirez v. Bemudez Garcia*, 898 F.2d 224 (1st Cir. 1990)..........................47

*TRW, Inc. v. Andrews,* 534 U.S. 19 (2001)................................................45

*United States v. Kubrick,* 444 U.S. 111 (1979) ..........................................34

*Urie v. Thompson,* 337 U.S. 163 (1949)...................................................47

*U.S. S.E.C. v. Geswein*, 2014 WL 861317 (N.D. Ohio Mar. 5, 2014) ....................39

*U.S. v. $7,599,358.09*, 2013 WL 3086107 (D. N.J. June 18, 2013) .......................37

*United States v. Welden,* 377 U.S. 95 (1964) ...........................................42

*U.S. ex rel. Joshi v. St. Luke's Hosp.*, 441 F.3d 552 (8th Cir. 2006)......................20

*U.S. v. Boykin*, 679 F.2d 1240 (8th Cir. 1982)...........................................24

*U.S.Dep't of Homeland Sec.,* 459 F.3d 565 (5th Cir. 2006) ...............................30

*Welch v. Theodorides-Bustle*, 677 F.Supp.2d 1283 (N.D. Fla.2010) ..........33, 51, 61

*White v. City of Fort Lauderdale*, No. 08-60771-CIV, s2009
WL 1298353 (S.D. Fl. May 8, 2009).......................................................30

Appellate Case: 14-1754     Page: 9     Date Filed: 05/28/2014 Entry ID: 4158496

## Statutes

7 U.S.C. §25 ................................................................................40

15 U.S.C. §15 ..............................................................................40

18 U.S.C. §2721 .....................................................................*passim*

18 U.S.C. §2724 .....................................................................*passim*

18 U.S.C. §2725 .....................................................................*passim*

26 U.S.C. §7431 ..........................................................................58

28 U.S.C. §2462 ..........................................................................39

28 U.S.C. §1658 ....................................................................*passim*

28 U.S.C.§2401 ...........................................................................40

28 U.S.C.§1331 .............................................................................1

28 U.S.C.§1291 .............................................................................1

28 U.S.C.§2462 ..........................................................................39

28 U.S.C. §7431 ..........................................................................58

42 U.S.C. §1983 ............................................................................7

## Legislative History

103 Cong. Rec. E2747 (Nov. 3, 1993) ...................................53

103 Cong. Rec. S15765 (Nov. 16, 1993) ................................53

103 Cong. Rec. S15762 (Nov. 16, 1993) ................................54

136 Cong. Rec. S17570-02 .....................................................41

Appellate Case: 14-1754    Page: 10    Date Filed: 05/28/2014 Entry ID: 4158496

138 Cong. Rec. H1785-01 (1992)...........................................................50

139 Cong. Rec. S15745-01 S15763 (1993) ...........................................50

148 Cong. Rec. S7350-04 …………………………………………………..41

## **Federal Rules of Civil Procedure**

Fed. R. Civ. P. 8(a)(2) (2012) .............................................................19

## **Other Sources**

John Koerner, *Between Healthy and Hartman: Probable Cause in Retaliatory Arrest Cases*, 109 Colum. L. Rev. 755 (May 2009) ......................24

George Orwell, Nineteen Eighty-Four 3-4 (Martin Secker & Warburg Ltd. 1949).............................................49

Appellate Case: 14-1754     Page: 11     Date Filed: 05/28/2014 Entry ID: 4158496

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Minnesota had federal-question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 2724. The District Court granted all Defendant/Appellees' motions to dismiss on February 21, 2014 and final judgment was entered on March 25, 2014. Johanna Beth McDonough filed this appeal on March 28, 2014. The Eighth Circuit Court of Appeals has jurisdiction to hear this appeal of the District Court's final judgment pursuant to 28 U.S.C. § 1291.

Appellate Case: 14-1754    Page: 12    Date Filed: 05/28/2014 Entry ID: 4158496

# STATEMENT OF THE ISSUES

**ISSUE #1**:  McDonough, a TV news reporter who has interacted with law enforcement as part of her job for years, alleges that Municipalities and their employees obtained her personal private information from motor vehicle records for purposes not permitted under the DPPA.  She specifically alleges:

    (a)    Law-enforcement officers retrieved her personal information from more than 500 times between 2006 and 2012;

    (b)    She has no history of criminal activity, nor been the subject of criminal investigation, that would serve as the basis for the accesses at issue;

    (c)    The volume of accesses is inconsistent with any conceivable law-enforcement or other permissible purpose given McDonough's background;

    (d)    Retrievals of McDonough's personal information were done on all days of the week, and at all times of the day and night;

    (e)    Officers from different municipalities obtained McDonough's information within minutes of one another on some days;

    (f)    Municipalities obtained McDonough's personal information to take a peek into this public person's private life;

2

(g)     The accesses at issue were impermissible and fall under no exception of the DPPA, not made in the course of carrying out law enforcement functions;

(h)     Municipalities' law enforcement did not obtain McDonough's private information from state motor vehicle records to carry out any official business; and

(i)     Testimony of Minnesota's Legislative Auditor in February 2013, revealed that at least 50% of Minnesota's law-enforcement officers are misusing the Department of Public Safety's database by accessing, disclosing, and/or using the driver license personal information for an impermissible purpose.

Neither Commissioners nor Municipalities have provided McDonough with the identities of the individual officers who accessed her data.   Under the alleged facts, and reasonable inferences to be drawn from them, did the District Court err in finding that McDonough's Complaint does not state plausible claims against Municipalities under the federal Driver's Privacy Protection Act?

**ANSWER TO ISSUE #1**:  Yes, McDonough's Complaint alleges sufficient facts, which taken as true, along with reasonable inferences, states a plausible DPPA claim against Municipalities and their employees, and these

3

claims should not have been dismissed.

**Apposite Cases:**

- *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

- *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)

- *Maracich v. Spears*, 133 S.Ct. 2191 (2013)

- *Mallak v. Aitkin County*, Civ. No. 13-2119 (DWF/LIB) 2014 WL 1285807 (March 31, 2014)

**ISSUE #2**:  Municipalities' employees repeatedly and surreptitiously retrieved McDonough's personal private information from state driving records, knowing their conduct was concealed and unknown to her.  Municipalities' conduct was not and could not reasonably be known to McDonough until she received an audit from the Minnesota Department of Public Safety in March 2013, identifying Municipalities.  To date, however, McDonough still has not been informed which individuals within Municipalities obtained her data.  Did the District Court err in finding McDonough's DPPA claims were time-barred under 28 U.S.C. § 1658(a)'s four-year statute of limitation, because her claims accrued upon occurrence of the acts, not upon McDonough's discovery of the violations and resulting harm?

**ANSWER TO ISSUE #2:**  Yes, the District Court erred, because there is no contrary directive from Congress, and the appropriate application of the

4

four-year statute of limitation regarding 28 U.S.C. § 1658(a) requires

imposition of the discovery rule, which renders McDonough's DPPA claims

timely.

**<u>Apposite Cases</u>:**

- *Maverick Transportation, LLC v. U.S. Department of Labor,* 739 F.3d 1149 (8th Cir. 2014)

- *Gabelli v. SEC,* 133 S.Ct. 1216 (2013)

- *English v. Parker*, 2011 WL 1842890 (M.D.Fla. May 16, 2011)

<u>**ISSUE #3**</u>:  Commissioners have established a drivers' records system that permits

law-enforcement officers to obtain and use Minnesota driver's personal

information based on the obtainer's law-enforcement status.  Commissioners do

not require any statement of purpose by the user, nor do they take any steps to

ascertain the user's purpose for obtaining an individual's personal information

from the DPS Database.  Did the District Court err in finding that Commissioners

and Department Public Safety Does cannot be liable to McDonough under the

DPPA for (1) disclosing personal information to Municipalities based solely on the

status of the requestor, and (2) failing to ascertain or taking any steps to reasonably

ensure that the persons obtaining  information have a permissible purpose or use

under the Driver's Privacy Protection Act?

     <u>**ANSWER TO ISSUE #3:**</u>  Yes, Commissioners and Department Public

Safety Does may be liable under the DPPA for allowing the disclosure of driver's license information to law-enforcement personnel based only on their status as peace officers, rather than determining if they had a permitted purpose to obtain the information as required by the DPPA, and McDonough should be allowed to proceed with her claim against them.

**<u>Apposite Cases</u>:**

- *Maracich v. Spears*, 133 S.Ct. 2191 (2013)

- *Pichler v. UNITE*, 542 F.2d 380 (3d Cir. 2008), *aff'g* 228 F.R.D. 230 (E.D. Pa. 2005)

- *Jones v. United States*, 97 F.3d 1121 (8th Cir. 1996)

- *Gordon v. Softech International*, 2013 WL 3939442 (2nd Cir. Jul. 31, 2013)

## STATEMENT OF THE CASE AND FACTS

On July 12, 2013, McDonough filed this lawsuit in the United States District Court for the District of Minnesota against past and former Commissioners of the Minnesota Department of Public Safety, numerous municipalities in the State of Minnesota, and unknown law-enforcement personnel whose identities are allegedly protected by the Minnesota Government Data Practice Act. McDonough brought claims under the following: Drivers Privacy Protection Act 18 U.S.C. § 2721 et. seq., 42 U.S.C. §1983, and Minnesota common law for invasion of privacy.

All Defendants but Al's Auto Sales and the Minneapolis Park and Recreation Board ("Park Board") moved to dismiss all claims, and McDonough opposed their motions. On October 25, 2013, the parties argued the motions before the Honorable Judge David S. Doty. On February 21, 2014, Judge Doty granted Commissioners' and Municipalities' motions to dismiss. [Dkt. 108]. McDonough voluntarily dismissed her claims against Al's Auto Sales and stipulated to dismiss her claims against the Park Board, both with prejudice. [Dkts. 109, 119]. On March 25, 2014, the District Court ordered all claims had been dismissed with prejudice and entered final judgment. [Dkt. 123].

This appeal follows [Dkt. 125]. McDonough appeals only plausibility under the DPPA, the commencement of the statute of limitations under the DPPA

Appellate Case: 14-1754    Page: 18    Date Filed: 05/28/2014 Entry ID: 4158496

and liability of the Commissioners and DPS Does under the DPPA.

## I. McDonough Is a Known and Recognizable Person in Her Community.

McDonough is a female news reporter in Minneapolis. (Complaint at 72.. She moved to Minneapolis, Minnesota, and became a crime reporter for the FOX 9 television station in the Twin Cities. (Compl. at A12.) Her work as a reporter has frequently brought her into contact with the police. (*Id.*)

## II. McDonough Provided Her Personal Information to Commissioners

The Department of Vehicle Services ("DVS") of the Department of Public Safety ("DPS") maintains a database containing motor vehicle records of Minnesota drivers ("DVS Database"). The DVS Database contains "personal information" and "highly restricted personal information," as defined by 18 U.S.C. §2725 ("Private Data"), including but not limited to names, dates of birth, driver's license numbers, addresses, driver's license photos, weights, heights, and eye colors of Minnesota drivers. (*Id.* at A13.) This information also includes social security numbers. (*Id.*) All such information is under the control and direction of Commissioners. (*Id.* at A18-20.)

McDonough supplied her Private Data to Commissioners to obtain a driver's license, under a promise her information would be safeguarded and kept private. (*Id.* at A30.) McDonough never waived or provided her consent for

8

Commissioners and Municipalities to obtain, use or disclose her personal private date from the DVS Database. (*Id.* at A27).

Commissioners knowingly disclosed McDonough's personal information to Municipalities. (*Id.* at A27-29). Access was automatically granted to Municipalities by issuance and use of a password, rather than by any type of ascertainment or checking of permissible use or purpose for access. (*Id*. at A20, 27, 32.)

Commissioners never audited, monitored, or implemented any other methods to ascertain, check for, or otherwise monitor the existence of permissible uses or purposes by Municipalities when accessing information on the DPS Database. (*Id.* at A20, 21, 24.) The DPS had a practice until late 2011 of refusing to permit any person from obtaining information as to who accessed their information, or whether anyone or any agency had done so. (*Id.* at A24.)

III.  **LAW ENFORCEMENT OFFICERS MADE STRAY COMMENTS TO MCDONOUGH IN THE PAST THAT DID NOT MAKE SENSE TO HER AT THE TIME, BUT NOW APPEAR TO RELATE TO THE ISSUES IN THIS CASE.**

Oddly, sometime between 2007-2008, Commissioner Dohman (who at the time was the Police Chief for the City of Maple Grove) met McDonough and offhandedly told her, "People are fascinated by you. Be a little careful." (*Id.* at A12.) In 2011, while McDonough was covering a shooting that took place Minneapolis, she overheard a Minneapolis police officer talking about her to

9

another police officer, stating "Oh yeah, she lives in Minnetonka. She's an out-of-stater." (*Id.*)

In 2012, McDonough was walking through City Hall in Minneapolis, when a Minneapolis police officer with whom she was unfamiliar said to her, "I like your new car." (*Id.* at A12).

## IV. MCDONOUGH'S INFORMATION WAS ILLEGALLY OBTAINED.

Municipalities had access to McDonough's drivers' license records, including her home address, date of birth, driver identification numbers, social security number, and images and photos of her over time, as well as her height, weight, and eye color. (*Id.* at A13.) The login page to the DPS website admonished users of the database that accessing of information was only to be done for "official business." (*Id.* at A25.)

Approximately 170 law-enforcement officers and individuals from Municipalities who had access to the system began looking up McDonough's private information on the DVS Database in 2006. (*Id.* at A3.) They viewed her home address, color photographs and images, date of birth, eye color, weight, height, and driver identification number. (*Id.* at A18.) Municipalities obtained her personal information nearly 500 times through 2012. (*Id.* at A23.) McDonough has not sued on accesses that reasonably would be permissible.

10

Certain employees of Municipalities repeatedly obtained McDonough's information by searching the DPS Database by her name. (*Id.* at A3.) For example, Minnesota Attorney General User 1 accessed McDonough's information 17 times in less than three months between August 31, 2007 and November 19, 2007. (*Id.* at A55-56.) Similarly, Minneapolis Police Department User 6 impermissibly obtained McDonough's information 26 times between November 4, 2008 and January 5, 2011. (*Id.* at A54.) State Patrol User 4 also had a high number of accesses of McDonough's information, with 13 lookups between November 5, 2008 and December 30, 2010. (*Id.* at A59-60.)

There are also several instances where Municipalities obtained McDonough's information in the middle of the night. For example, on January 1, 2008 Minneapolis Police Department User 37 obtained McDonough's information 6 times between 1:08 a.m. and 1:13 a.m. Similarly, on May 2, 2009, Minneapolis Police Department User 40 accessed McDonough's information seven times between 12:58 a.m. and 1:46 a.m. These incidents also occurred by multiple users around the same time. An on November 6, 2008 Bloomington Police Department User 6 and Dakota Communications User collectively accessed McDonough's information 8 times between 5:25 a.m. and 5:50 a.m.

All of the accesses reported in the DPS audit were by her name only, not license plate. (*Id.* at A3.) Since no accesses were by license plate, no random

11

checking of the vehicle McDonough drove could be the source of the accesses; rather, these accesses were personal to the employees looking McDonough up by name. (*Id.* at A3.) Seldom does any law enforcement reason exist to search for and access a person's Private Data by name lookup unless that individual is involved in or suspected of criminal activity. (*Id.*)

Municipalities' employees have had no permissible purpose, no probable cause, and no reasonable suspicion to obtain McDonough's personal information on the dates and times at issue in this matter. (*Id.* at A27.) None of the obtainments by Municipalities and their employees were done in course of conducting official business. (*Id.* at A31.) The retrievals of her information were not for any law-enforcement function or purpose, but were rather to satisfy personal curiosity and to peek into the private life of this public figure. (*Id.* at A2-3). All of the accesses at issue in this case by Municipalities were knowingly made and were for purposes not permitted under the DPPA. (*Id.* at A13-18.)

The extent of this illegal retrieval of individuals' private information is widespread and pervasive throughout departments like those of Municipalities; this information abuse is reported by almost all officers and experts as both widespread among departments and pervasive within the different ranks of each department from "chiefs on down." (*Id.* at A26.) Misuse of private information is the primary complaint of most police chiefs and human resources personnel of agencies like

12

those of Municipalities.  (*Id.* at A29.)

Commissioners and Municipalities knew that law enforcement officers were illegally accessing the DPS Database at the time McDonough's information was impermissibly obtained.  (*Id.* at A21.)  The Minnesota Legislative Auditor has also testified and reported that at least 50% of the law enforcement officers in Minnesota have misused the DPS database by obtaining, disclosing, and/or using the Private Data like McDonough's without a permissible purpose.  (*Id.*)  These illegal accesses of Private Data occurs disproportionately to women.  (*Id.* at A27.)

## V.  MUNICIPALITIES ACTIVELY CONCEALED INFORMATION RELATING TO THEIR ILLEGAL ACCESSES.

McDonough did not know or have reason to suspect that her private information was being accessed illegally until approximately March 19, 2013.  (*Id.* at A23.)  The audit she received from DPS in March 2013 confirmed that law enforcement had retrieved her personal information hundreds of times searching by her name—not by license plate.  (*Id.*)

Even though McDonough was able to obtain an audit from DPS in March, 2013, the audit does not identify any of the individuals who obtained McDonoughs private information.  (*Id.* at A47-61.)  Commissioners and Municipalities have kept the nature of these accesses concealed and hidden from McDonough.  (*Id.*)  In the ultimate irony, DPS refuses to provide information regarding the individuals

13

documented to have made the accesses based on privacy reasons. (*Id.* at A24.)

None of the Municipalities or the John and Jane Doe law-enforcement personnel ever told McDonough that they were surreptitiously accessing their private, personal driver's license information. (*Id.* at A22.) As a result, the identities of the law-enforcement officers making the impermissible accesses have been (and continue to be) concealed from McDonough.

Appellate Case: 14-1754    Page: 25    Date Filed: 05/28/2014 Entry ID: 4158496

15

# SUMMARY OF THE ARGUMENT

Under the DPPA, a plaintiff must plead that her personal information was obtained, used, or disclosed from motor vehicle records for a purpose not permitted under the statute. The plaintiff must only plead the absence of a permissible purpose, not the specific purpose of any person obtaining his/her data. In Minnesota, where the identity of the individual who accessed a person's data is ironically protected until discovery, it would be impossible to plead anything further unless the perpetrator told the victim he or she obtained their Private Data. To require more at the pleading stage, makes it impossible for a plaintiff to allege clear violations of federal law that will be fleshed out in discovery. McDonough pled that law-enforcement personnel obtained her personal information from the DPS Database more than 500 times, often at odd hours and by personnel from multiple municipalities within minutes of each other. She further pled that law enforcement did so without any law-enforcement purpose and that such accesses were not part of any official business, but rather out of personal interest. Such pleading is sufficient to meet *Twombly* and *Iqbal* standards and to allow McDonough to proceed to discovery in her case.

Unless Congress provides a "contrary directive," the law of this Circuit is that the general discovery rule applies to statutes of limitations. The applicable statute of limitations for the DPPA is the four-year period found in 28 U.S.C.

16

§1658(a). That catch-all statute does not indicate that the occurrence rule applies. Rather, it uses the term "accrues," which typically indicates that the discovery rule will apply. 28 U.S.C. §1658(b) provides no guidance as it was part of the Sarbanes Oxley Act passed 12 years after §1658(a), and includes both a discovery rule and occurrence rule. The District Court's reliance of *Gabelli v. SEC*, 133 S.Ct. 1216 (2013) is misplaced, because that case's holding was limited to SEC enforcement actions. Rather, *Gabelli* recognized that a plaintiff like McDonough should not have to "live in a state of constant investigation . . . [and] spend her days looking for evidence that [she was] lied to." *Id.,* 133 S.Ct. at 1222. A DPPA claim should not accrue until an individual knows or has reason to know in the exercise of reasonable diligence that their privacy has been breached under §1658(a).

The DPPA creates a private cause of action against Commissioners who have responsibility for controlling the DPS Database and ensuring that information is appropriately obtained, used, and/or disclosed from it. The DPPA not only sets forth *who* may obtain information from motor vehicle records, but it also states *for what purpose* that can be done. The DPPA allows law-enforcement officers to access McDonough's personal information, but only for a law-enforcement purpose. Commissioners do not require any statement of purpose by the Municipalities' users, nor do they take any steps to ascertain whether those users' purposes are law-enforcement related. As a result, Commissioners have failed to

Appellate Case: 14-1754    Page: 28    Date Filed: 05/28/2014 Entry ID: 4158496

comply with the DPPA, and McDonough's claims against them should proceed.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure require merely "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (2012). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation omitted). A complaint states a plausible claim if its "factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 665. Plausibility "simply calls for enough fact to raise a reasonable expectation that *discovery will reveal evidence*" of the claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (internal citation and quotation omitted) (emphasis added).

For purposes of a motion to dismiss, the plaintiff's factual allegations must be treated as true, as well as all reasonable inferences arising from the facts as alleged. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "The complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *See Braden v. Wal-Mart Stores*, 588 F.3d 585, 594-95 (8th Cir. 2009) (noting *Twombly* and *Iqbal* do not change the requirement the district court draw inferences in favor of the non-moving party).

This Court reviews *de novo* the District Court's granting of the motion to dismiss, accepting as true the allegations contained in the Complaint and "drawing

19

all reasonable inferences in favor of the nonmoving party." *U.S. ex rel. Joshi v. St. Luke's Hosp.*, 441 F.3d 552, 555 (8th Cir. 2006).

## I. THE DISTRICT COURT ERRED WHEN FINDING MCDONOUGH'S CLAIM NOT PLAUSIBLE.

The District Court erred in finding McDonough's DPPA claim not plausible for three reasons. First, Mcdonough's factual allegations, accepted as true, demonstrate Municipalities' violation of the DPPA. Second, reasonable inferences drawn from the allegations also demonstrate a plausible DPPA claim. The *only* reasonable inference from the Complaint is her information was obtained for a purpose not permitted under the DPPA. Finally, the District Court relied on inapposite cases in reaching its conclusions.

### A. Municipalities Must Have a Permissible Purpose To Lawfully Access Anyone's Personal Information.

McDonough's allegations satisfy the three elements of a DPPA violation: (1) obtainment, use, or disclosure of personal information; (2) from a motor vehicle record; and (3) for a purpose not permitted under the statute. *Taylor v. Acxion Corp.,* 612 F.3d 325, 335 (5th Cir. 2010). The first and second elements cannot be reasonably disputed, and thus only the third element is at issue.

#### i. *McDonough Need Not Prove any Specific Impermissible Purpose.*

The District Court erred when it required McDonough to plead what

20

Municipalities' specific <u>impermissible</u> purpose was in obtaining her information. Such a standard is at odds with the Supreme Court when it expressly held "[d]isclosure of personal information is *prohibited unless for a purpose* permitted by an exception listed in 1 of 14 statutory exceptions."  *Maracich v. Spears,* 133 S.Ct. 2191, 2195 (2013) (emphasis added).  Thus, McDonough must only plead that the accessor/obtainer did not act with a purpose permitted under the DPPA (here, a law-enforcement purpose); McDonough does not have to identify what the specific improper purpose was.

1.  <u>The Statute Renders Municipalities Liable if they Obtained Data for any "Purpose not Permitted."</u>

The default setting of the DPPA is non-disclosure.  *Maracich,* 133 S.Ct. at 2195.  Section 2721 plainly states that no information can be released "except as provided in subsection (b)."  18 U.S.C. §2721(a).  The exception primarily at issue in this case is the "law enforcement function" exception of §2721(b)(1).[1]  Thus, McDonough must allege that for whatever purpose her information was obtained, it was not done by the Municipalities "*in carrying out its functions.*"  18 U.S.C. §2721(b)(1) (emphasis added).  The statutory language renders Municipalities liable "*unless* [the information is obtained] for a permitted purpose, such as a law

---

[1] In addition, the car dealer exception generally set forth in 2721(b) was at issue, as shown by the first named defendant in the caption, Al's Auto Sales, Inc., who settled with McDonough and has been dismissed from the suit.

21

enforcement function." *Smythe v. City of Onamia*, 2013 WL 2443849 at *6 (D. Minn. June 5, 2013) (emphasis added).

The inherent flaw in the District Court's ruling is that any requirement that McDonough plead a specific bad or improper purpose, beyond what she has alleged, implicitly requires McDonough to know and identify the specific person who obtained her data. McDonough, however, is *unable* to name the specific obtainer, because the audit provided by DPS never reveals such a name. (*See* Ex. A to Compl. at A47-A61) The violators' identities ironically are kept secret by DPS, citing the Minnesota Government Data Practices Act. Those identities are only revealed in discovery. Accordingly, any requirement that McDonough identify the specific identity or intent of the accessor requires her to plead the subjective thoughts of *unknown* persons. The DPPA requires no such thing.

The specific exception at issue, (b)(1), states that information may be obtained, used, or disclosed "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions." Thus, McDonough needs to plead that the Municipalities *did not* obtain, use, or disclose the information in "carrying out their functions," not identify any specific *bad* purpose. McDonough has alleged a series of specific facts whose reasonable inferences show each obtainment was not to "carry out its

22

functions."

2.  Any Exceptions to the Purposes are Construed Narrowly.

In *Maracich,* the Supreme Court affirmed the broad scope of the DPPA while narrowly construing its exceptions:

> An exception to a "general statement of policy" is "usually read ... narrowly in order to preserve the primary operation of the provision." *Commissioner v. Clark,* 489 U.S. 726, 739 (1989). … Unless commanded by the text, however, these exceptions ought not operate to the farthest reach of their linguistic possibilities if that result would contravene the statutory design.

*Maracich,* 133 S.Ct. at 2200.

In narrowly construing the DPPA's exceptions, the Supreme Court confirmed that privacy rights protected by the DPPA are extremely important and should not be limited without Congress' express intent.  *Id.* at 2200.  The Supreme Court further explained that motor-vehicle information is central to citizens' rights to privacy:

> An additional reason to hold that (b)(4) does not permit solicitation of clients is because the exception allows use of the **most sensitive kind of information,** including medical and disability history and Social Security numbers. To permit this **highly personal information** to be used in solicitation is so **substantial an intrusion on privacy** it must not be assumed, without language more clear and explicit, that Congress intended to exempt attorneys from DPPA liability in this regard.

23

*Id.* at 2202 (emphasis added). In *Maracich*, the Supreme Court expressly held that the DPPA protects fundamental rights of privacy, and thus, any exceptions are to be narrowly construed. *Id.* at 2200.

Notwithstanding *Maracich*, the District Court declined to mention or acknowledge the sensitive nature of McDonough's information at issue or the privacy concerns implicated by its disclosure to those who have no legitimate reason to obtain it. Rather, the District Court contradicted *Maracich* and instead reasoned that Congress intended "to preserve broad discretion for government entities and agents in accessing motor vehicle records." (Order at A291.)

3. <u>The Presumption that Public Officers have Properly Discharged Their Duties is Not Applicable.</u>

The District Court erred when it found that officers, who collectively obtained McDonough's information nearly 500 times, were entitled to a presumption of regularity. First, this presumption is rarely granted to individual police officers. *See* John Koerner, *Between Healthy and Hartman: Probable Cause in Retaliatory Arrest Cases*, 109 Colum. L. Rev. 755, 781-82 (May 2009); *see also McSurely v. McClellan*, 697 F.3d 309, 324 (D.C. Cir. 1982) (presumption of regularity attaches to judge's independent approval of warrant, but not to the officer's illegality in procuring it, or in searching beyond scope of warrant). Instead, it is typically granted to high-ranking officials, such as prosecutors when

24

exercising discretionary authority.  S*ee Harman v. Moore*, 547 U.S. 250, 264

(2006) (noting that due to the "longstanding presumption of regularity accorded to

prosecutorial decision-making…judicial intrusion into executive discretion of such

high order should be minimal"); *U.S. v. Boykin*, 679 F.2d 1240, 1246 (8th Cir.

1982), *abrogated on other grounds by Batson v. Kentucky*, 476 U.S. 79, 92, 92

n.16 (1986).  The allegations against municipalities here do not involve high-level

decision-making, but rather Municipalties' employees obtaining McDonough's

information out of personal curiosity because she is a television

reporter.  Certainly, at this stage, if this presumption applied regularly to law

enforcement, no civil rights suits against police officers would ever survive

dismissal.

   Second, the statute itself specifically prevents anyone from using, obtaining

or disclosing drivers' license data unless it is for a purpose identified in the DPPA.

*See Maracich,* 133 S.Ct. at 2198.  If Congress wanted to maintain a presumption of

regularity for public officials under the DPPA, it would not have included the

language "[f]or use by any government agency, including any…law enforcement

agency *in carrying out its functions*."  18 U.S.C. §2721(b)(1).  Rather, Congress

would have just allowed use by a law-enforcement agency without the qualifying

"purpose" language.

Appellate Case: 14-1754    Page: 36    Date Filed: 05/28/2014 Entry ID: 4158496

**B. McDonough's Allegations Specifically Allege that Municipalities Obtained Her Private Data For a Purpose Not Permitted.**

McDonough's allegations contain a series of *specific* facts that lead to the reasonable inference that Municipalities' obtainment or use of information was not to "carry out its functions," or to satisfy a law-enforcement purpose. In other words, McDonough's allegations, and its reasonable inferences, show that Municipalities did not act with a proper or permissible purpose in obtaining her private data.

The District Court reasoned that McDonough relied only on the sheer volume of accesses to support her DPPA claim, but the allegations in McDonough's Complaint go well beyond that allegation. McDonough also affirmatively alleged that she has no criminal history and no reasonable cause exists for the excessive attention on her and retrieval of her information. McDonough also presents allegations showing a professional relationship between her and law-enforcement officers that create a reasonable inference that Municipalities' employees had personal reasons for looking her up. In addition, McDonough presented factual allegations regarding known abuse and misuse of the DPS system, as reported by the Minnesota Legislative Auditor, which also allows reasonable inferences of misuse in the context of McDonough as well.

The District Court also gave no import to the audit report attached to

26

McDonough's Complaint, which also demonstrate patterns of behavior that further lead to the reasonable inference that Municipalities obtained McDonough's personal information for purposes other than those permitted under the DPPA. For instance, specific users and entities <u>excessively</u> obtained McDonough's information; it appears that certain persons with access to the DVS database were following McDonough over a period of years, presumptively unrelated to any criminal activity, and more likely related to McDonough's job of news reporter, with her face and persona often in the local news. (Ex. A, at A47-61.) For example, Minnesota Attorney General User 1 accessed McDonough's information 17 times in less than three months between August 31, 2007 and November 19, 2007. State Patrol User 4 also had a high number of accesses of McDonough's information, with 13 lookups between November 5, 2008 and December 30, 2010. These excessive amounts of obtainments from isolated users cannot be explained by any permissible reason. Although McDonough had a DWI on her record and did experience a moderate volume of permissible obtainments related to the charge, McDonough has not brought suit over those obtainments.

In addition, many of the obtainments occurred between 11:00 p.m. and 6:00 a.m. While limited law-enforcement activities take place at night, it is unlikely that all of the obtainments of McDonough' information occurring during that time period were made for a permissible reason. For example, on January 1, 2008

27

Minneapolis Police Department User 37 obtained McDonough's information 6 times between 1:08 a.m. and 1:13 a.m.  Similarly, on May 2, 2009, Minneapolis Police Department User 40 accessed McDonough's information 7 times between 12:58 a.m. and 1:46 a.m.

The allegations related to the audit alone demonstrate the plausibility of McDonough's DPPA claim.  But those allegations, combined with McDonough's personal background, interaction with police officers as part of her job, comments that officers have made demonstrating special knowledge of McDonough's personal information, and the known and reported abuse and misuse of the DPS database, make McDonough's DPPA claim not only plausible, but probable.

Given that McDonough is not allowed to know who the specific obtainers of her information were, because this has been (and is being) withheld from her unless or until discovery in this lawsuit, there are no other factual allegations that McDonough can plead.  But what she has pled raises "a reasonable expectation that *discovery will reveal evidence*" of her DPPA claims.  *See Twombly* 550 U.S. at 545 (emphasis added).  To hold otherwise defies logic and turns the plausibility standard on its head.

## C. The Pleading Burden Proposed by the District Court Unfairly Presents a Different Standard Because Law Enforcement is Involved.

Appellate Case: 14-1754     Page: 39     Date Filed: 05/28/2014 Entry ID: 4158496

The DPPA identifies exceptions for disclosure of personal information. Those exceptions set forth status (i.e., law enforcement, insurer, car dealer, or private investigator) requirements for the obtainer. 18 U.S.C. §2721(b)(1)- (14). Within each status, a specific purpose must also be shown; for example, an insurer may access, but only for "claims investigation activities, antifraud activities, rating or underwriting." 18 U.S.C. §2721(b)(6).

If a plaintiff pled in her complaint that she had not been in any accident, had no claim, was not involved in any fraud, rating or underwriting, that would typically be all that she could allege to show that accesses by insurers were improper. Were a plaintiff to sue a car dealer or towing company under §2721(b)(7) alleging that her car had never been towed or impounded, that would be sufficient to allege a claim against the towing company.

The same standard should apply to law enforcement. If a plaintiff, like McDonough, alleges that none of the accesses relate to her DWI, then the reasonable inference that the voluminous accesses do not arise from law enforcement should be sufficient to state a claim against Municipalities.

### D. The District Court Relied on Inapposite Cases to Reach its Conclusion.

i. *Kost is Distinguishable Based on its Facts.*

The District Court, while not expressly relying on the *Kost v. Hunt* ("*Kost*

29

*I''*) decision, nevertheless cites it, and the *Kost* opinion was the first of its kind in the District of Minnesota, but *Kost* is inapplicable in this situation. In *Kost*, the Court dismissed the complaint, holding that "the Plaintiffs fail to point to any facts alleged in the complaint which could support a plausible inference" of a claim. No. 13-583 (JNE/TNL), 2013 WL 5566045 at *4 (D. Minn. Oct. 8, 2013).

But the *Kost* Complaint and allegations are far different from McDonough's. One important distinction is that the McDonough only brings claims where the Appellees obtained her information by **entering her name, "Beth McDonough**," and never by a license plate search. (See Compl. at A4 cf. *Kost* Complaint and Amended Complaint, *Kost v. Hunt,* 13-CV-00583 JNE-TNL, Dkt. 1 and 9.) Accessing via a license plate could reasonably relate to a determination of whether a car is stolen or looking up a speeding car. However, in neither of those scenarios would the law-enforcement officer be looking up information using a person's name. Thus, this Court can reasonably infer a name search will rarely be for a law-enforcement purpose unless the person whose information has been accessed is being arrested, under investigation or has reported a crime. [2] Since McDonough

---

[2] In *Kost,* the District Court also briefly refers to a "law enforcement privilege" to "preserve broad discretion for law enforcement agents to retrieve information **in the course of their duties**." *Kost I*, 2013 WL at 5566605 at *5. The allegations in this case are that law-enforcement officers [and others] obtained McDonough's information NOT in the course of their duties, in part because these violations were name accesses, not license plate accesses. Because the accesses could not have

30

has specifically pled name look-ups and excluded those look-ups that would relate to her DWI arrest, her Complaint is quite different than those in *Kost*.

In further contrast, McDonough also alleges that she is a well-known news reporter who has worked with numerous law-enforcement officers in the course of her duties. (Compl. at A12.) Additionally, she alleges that this illegal activity by law enforcement is disproportionately directed against women. (*Id.* at A27.) These allegations permit this Court to reasonably infer the bases for Appellees' illegal conduct. Given the totality of McDonough's allegations, she is entitled to discovery to establish evidence to prove her claims. Assuming this case proceeds, McDonough will be allowed to learn the identities of the individuals who actually accessed her private information and McDonough will substantiate her allegations that many of the individuals accessing her information were doing so in large part

---

been in the course of their duties, the privilege would not apply. The "law enforcement privilege" is typically only applied where disclosure would release sensitive information in ongoing criminal investigations, not to cyber-snooping of innocent drivers because they are attractive or interesting, or happen to be seen reporting the news on television as here. *See In re U.S.Dep't of Homeland Sec.,* 459 F.3d 565, 569 (5th Cir. 2006); *See also White v. City of Fort Lauderdale*, No. 08-60771-CIV, s2009 WL 1298353, at *2-*3 (S.D. Fl. May 8, 2009) (citing cases); *cf. also In re The City of New York,* 607 F.3d 923, 944 (2d Cir 2010) (where plaintiff sought information about legitimate law-enforcement undercover activities that would have "undermined the confidentiality of sources" and "hindered the NYPD's ability to conduct future undercover investigations."). McDonough has pled that there were no ongoing investigations for the obtainments sued over.

31

due to her gender, profession, and physical appearance. There is undoubtedly a "reasonable expectation that *discovery will reveal evidence*" of her claims. *Twombly* 550 U.S. at 545 (emphasis added).

> ### ii. *Lancaster* is Inapposite, Because of the Nature of Allegations in this Case.

The District Court's erred in its application of *Lancaster v. City of Pleasanton*, an inapposite case without any precedential authority. No. C-12-05267, 2013 WL 5182949 (N.D. Cal. Sept. 13, 2013). *Lancaster* involved allegations of defendants who obtained information to gain "advantage in a custody dispute." *Id.* at *4. As *Lancaster* found, the obtainment and use was permissible under exception (b)(4), "in connection with any civil…proceeding in any Federal, State or local court or agency." *Id.* at *4 (citations omitted). Thus, in *Lancaster*, "defendant's use of the DMV records *falls squarely under the court proceedings exception* to the statute," as they would be used in a child custody matter before the courts. *Id.* (emphasis added).

Here, there are no such allegations. McDonough has not alleged that the information was being used to gain an advantage in any custody or court proceedings. McDonough has specifically alleged that she was not under investigation at the time of the obtainments that she is suing over, nor was she involved in any litigation with the Appellees. Thus, based on McDonough's

32

allegations, *Lancaster* bears no weight.

### E. McDonough's Complaint is Plausible.

With the totality of the facts alleged in McDonough's Complaint, including very specific information set forth in the audit, this Court can reasonably infer that Defendant-Appellees' accesses of her information was for a purpose <u>not</u> permitted under the statute. She does not have the benefit of even knowing who the specific accessors were, so, she cannot be any more specific as to what these unknown individuals were doing or thinking. But she does not have to be any more specific.

As one District of Minnesota case recognized, violations of the DPPA occur "*unless* [the obtainment was] for a permitted purpose, such as a law enforcement function." *Smythe,* 2013 WL 2443849 at *6 (D. Minn. 2013). Another court has held allegations similar to McDonough's are "more than a merely conclusory statement that those Defendants conducted an 'impermissible' search." *Mallak v. Aitkin County*, 13-CV-02119 (DFW/LIB), 2014 WL 1285807, at *9 (D. Minn. March 31, 2014). *Mallak* added:

> …[T]he Court finds the facts…sufficiently establish a plausible inference or reflect an "outward manifestation" of an impermissible purpose to state a claim at this early stage. This finding requires neither an inference as to "what went on in a particular officer's mind" nor an impermissible burden shift to defendants in DPPA cases.

33

*Id.* at p. 22, fn. 12. (Plaintiff was well-known attorney without a criminal history whose audit showed 190 obtainments made by name and at odd hours, but at the pleading stage was denied the names of the accessors of her private information); *see also Welch v. Theodorides-Bustle*, 677 F.Supp.2d 1283, 1287 (N.D. Fla.2010) (stating it is "hard to plead a negative with great specificity; that there was no permissible purpose for the disclosure is about as precise as one could be.") The parties know what the claims are; the factual basis for those claims is clear on the face of the Complaint.

Appellate Case: 14-1754    Page: 45    Date Filed: 05/28/2014 Entry ID: 4158496

## II. THE DPPA'S STATUTE OF LIMITATIONS SHOULD BE GOVERNED BY THE DISCOVERY RULE.

The District Court erred when it held that the "occurrence" rule of accrual applies to 28 U.S.C. §1658(a), the applicable statute of limitations to the DPPA. Absent contrary Congressional directive, the discovery rule, where claims accrue "when the plaintiff discovers, or with due diligence, should have discovered, the injury which is the basis of the litigation, always applies." *Comcast of Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 944 (8th Cir. 2007); *see also Maverick Transportation, LLC v. U.S. Department of Labor,* 739 F.3d 1149, 1154 (8th Cir. 2014); *United States v. Kubrick,* 444 U.S. 111, 122–24 (1979). .

### A. The Default Rule for Statute of Limitations is the Discovery Rule.

The DPPA's statute of limitations is governed by §1658(a), a catch-all statute that states "a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action **accrues**." (emphasis added).

Virtually all federal courts have applied the general discovery rule as the default rule, unless the applicable statute of limitation requires the application of the injury-occurrence rule. *See Rotella v. Wood*, 528 U.S. 549, 555 (2000) (federal courts "generally apply a discovery accrual rule when a statute is silent on the issue"); *Maverick Transportation,* 739 F.3d at 1154 (applying discovery absent a

35

contrary directive from Congress); *Andersen v. U.S. Dept. of Housing and Urban Dev.,* 678 F.3d 626, 628 (8th Cir. 2012) (applying discovery rule to Federal Tort Claims Act cases, containing identical "accrual" language as §1658(a)); *Comcast of Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 944 (8th Cir. 2007) ("discovery rule applies in the absence of a contrary directive from Congress"); *see also Dique v. New Jersey State Police*, 603 F.3d 181 (3d Cir. 2010) (applying discovery rule to §1658(a)); *Mangum v. Action Collection Services,* 575 F.3d 935, 940 (9th Cir. 2009) (holding that "the discovery rule applies to statutes of limitations in federal litigation"), *Disabled in Action of Penn. v. Se. Penn. Trans. Auth.*, 539 F.3d 199, 209 (3rd Cir. 2008) ("absence of a contrary directive from Congress, we apply the federal discovery rule."); *Fayemi v. Offerman*, 99 Fed. Appx. 480, 481 (4th Cir. 2004) (Limitations period commences when plaintiff has knowledge or, in the exercise of due diligence would have knowledge), *In re Monumental Life Ins. Co.*, *Indus. Life Ins. Litig*., 365 F.3d 408, 420 (5th Cir. 2004) (applying discovery rule in assessing when a claim accrues for purposes of federal law).

> i. *The Law in the Eighth Circuit is that the Discovery Rule of Accrual Applies, Unless Congress States Otherwise.*

The Eighth Circuit Court of Appeals has applied the discovery rule in the "absence of a contrary directive from Congress." *Comcast,* 491 F.3d at 944; *Maverick Transportation,* 739 F.3d at 1154. Thus, the McDonough's claims

36

accrue only when she had reasonable notice of a claim.  This Circuit is in line with virtually every other circuit on this issue: the default rule is the discovery rule. Without any specific directive to the contrary, this Court should therefore apply the default rule, which is the discovery rule.

### ii.  *Virtually all Courts Limit the Applicability of* <u>Gabelli</u>.

Virtually all courts limit *Gabelli*'s applicability, and *Gabelli* is inapposite. *Gabelli* was a fraud case, but the Supreme Court expressly refused to apply the discovery rule in the context of that SEC enforcement action, because the Government sought a "different kind of relief" and was a "different kind of plaintiff."  *Gabelli v. SEC,* 133 S.Ct. 1216, 1221-1223 (2013).  The Court reasoned that the SEC is different from a defrauded plaintiff, because the SEC has powerful enforcement tools at its disposal to combat fraud.  *Id.* at 1222 (the SEC "as enforcer is a far cry from the defrauded victim the discovery rule evolved to protect.").  Furthermore, the SEC was not seeking damages, but rather penalties, and it "'would be utterly repugnant to the genius of our laws' if actions for penalties could 'be brought at any distance of time.'"  *Id.* at 1223 (citing *Adams v. Woods*, 2 Cranch 336, 342 (1805)).  Thus, the Court recognized that applying the discovery rule to an SEC enforcement action would be inappropriate, and would not remedy any scenario the discovery rule was intended to rectify.  *Id.* at 1222 ("There are good reasons why the fraud discovery rule has not been extended to

37

Government enforcement actions for civil penalties.").

*Gabelli's* rationale actually favors the application of the discovery rule here. The SEC's role is to be the constant investigator – whereas here, McDonough is charged with no such duty to "spend [her] days" looking for a cause of action. McDonough is not an "enforcer" with tools such as an investigative staff or subpoena power at her disposal to uncover her injuries. Moreover, her suit is not to "punish," but rather to be compensated for the harms suffered when her privacy rights were violated nearly 500 times.

*Gabelli*, by its own reasoning, is limited. Based on long-standing law, *Gabelli* likely would have applied the discovery rule had the SEC been a private plaintiff. *Gabelli*, 133 S.Ct. at 1221 ("we have never applied the discovery rule in this context, where the plaintiff *is not a defrauded victim*.")

Courts have limited *Gabelli*'s applicability. In *Donell v. Mojtahedian*, the Central District of California found that *Gabelli* "*only held* that the 'fraud discovery rule has not been extended to Government enforcement actions for civil penalties.'" 2013 WL 5143035 at *4 (C.D. Cal. Sept. 12, 2013) (emphasis added). In *U.S. v. $7,599,358.09*, that Court found that *Gabelli* was concerned only with "whether courts should read a discovery rule into the statute of limitations at issue in that case." 2013 WL 3086107 at n. 4 (D. N.J. June 18, 2013). In *Carsanaro v. Bloodhound Techs., Inc*., 2013 WL 1104901, at *19-20, (Del. CH. Mar. 15, 2013),

38

the court refused to apply the occurrence rule to an individual securities claim, but instead applied the discovery rule, quoting the language in *Gabelli* that "[m]ost of us do not live in a state of constant investigation; absent any reason to think we have been injured, we do not typically spend our days looking for evidence that we were lied to or defrauded.  And the law does not require that we do so."  *Gabelli,* 133 S.Ct. at 1222.

The vast majority of courts throughout the nation have read *Gabelli* as applying only to penalty enforcement actions by the government.  This Court should also do so, in light of its recent decision in *Maverick Transportation* decided after *Gabelli*.  *Maverick Transportation* is not contrary to *Gabelli* and comports to long-standing accrual rules in this circuit and others.  *Maverick Transportation,* 739 F.3d 1149 (expressly holding as good law its decision in *Comcast*).

The *Gabelli* Court did refer to the "**fraud** discovery rule" but simply because the only cause of action asserted in that case was securities fraud.  *Gabelli* continued to support the discovery rule's viability in cases involving latent, self-concealing, and inherently difficult-to-discover injuries:

> The discovery rule exists in part to preserve the claims of victims who do not know they are injured and who reasonably do not inquire as to any injury.  Usually when a private party is injured, he is ***immediately*** aware of that injury and put on notice that his time to sue is running.

39

> But when the injury is **<u>self-concealing</u>**, private parties may be
> unaware that they have been harmed.

*Gabelli*, 133 S.Ct. at 1222.  Again, Courts have strongly limited *Gabelli* to

"[g]overnment enforcement actions for civil penalties."  *See, e.g., S.E.C. v.*

*Amerindo Inv. Advisors, Inc*., 2014 WL 405339, at \*9 (Feb. 3, 2014) (rejecting any

application of *Gabelli* as "the statute of limitations at issue in *Gabelli* applies only

to civil penalties, and does not prevent a finding of liability or an awarding of other

kinds of remedies"); *U.S. S.E.C. v. Geswein*, 2014 WL 861317, at 8 (N.D. Ohio

Mar. 5, 2014)("The Court finds that *Gabelli* announces only the narrow holding

that the discovery rule is inapplicable to actions for civil penalties brought by the

SEC."); *S.E.C. v. Pentagon Capital Management PLC*, 725 F.3d 279, 287 (2d Cir.

2013) ("In *Gabelli*, the Supreme Court held that the so-called 'discovery rule',

which tolls a statute of limitations for crimes that are difficult to detect, does not

apply to toll the five-year statute of limitations in SEC enforcement actions;" also

noting that disgorgement award was not a civil penalty).  *S.E.C. v. Wyly*, 950 F.

Supp. 2d 547, 555 (S.D.N.Y. 2013 ("On February 27, 2013, the Supreme Court

held that the discovery rule is unavailable in SEC enforcement actions governed by

28 U.S.C. section 2462.").  The most accurate and comprehensive reading of

*Gabelli* is that it was never intended to bar the application of the discovery rule to

McDonough's claims.

Appellate Case: 14-1754     Page: 51     Date Filed: 05/28/2014 Entry ID: 4158496

41

## B. Congress Never Intended to Modify Section 1658(a)'s Application of the Discovery Rule With the Inclusion of Section 1658(b).

### i. Application of 1658(a) is the same as Other Statute of Limitations.

Courts have overwhelmingly found the discovery rule applies when interpreting statutes with similar "accrual" language.  For example, in *In re Weldeabzghi*, that Court found a plaintiff's claim "accrues" when the plaintiff "either knew, or in the exercise of reasonable diligence should have known, that [she] had a claim." *In re Weldeabzghi*, 2013 WL 717755 at *4 (D. Minn. Feb. 27, 2013) (citing *Izaak Walton League of America, Inc. v. Kimbell*, 558 F.3d 751, 759 (8th Cir. 2009)); *Loudner v. United States,* 108 F.3d 896, 900 (8th Cir.1997) (addressing accrual, for the purposes of 28 U.S.C. §2401(a) occurs upon discovery).  Similarly, a court applied the discovery rule to 7 U.S.C. §25(c), noting "[w]here a federal statute is silent on the issue of when a cause of action accrues … courts apply a discovery accrual rule wherein discovery of the injury … starts the clock."  *In re LIBOR-based Fin. Ins. Antitrust Litig*., 2013 WL 1285338, at *21 (S.D.N.Y. Mar. 29, 2013) (citations omitted).  Courts also applied the discovery rule to civil RICO claims governed by 15 U.S.C. §15(b).  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 150-151 (2nd Cir. 2012).  Although fraud cases, those courts did not base their application of the discovery rule on fraud, but simply *applied* the discovery because the applicable statute of limitation was silent on accrual.

42

*ii.   Legislative History Suggests that Congress did not Intend to Modify 1658(a)'s Use of the Discovery Rule.*

Four years before the enactment of the DPPA, Congress passed §1658, solely to provide a uniform, "fall-back" statute of limitations.  Nothing in the legislative history indicated any intention on the part of Congress to alter the accrual rules applicable to many different federal statutes of limitation.  *See* 136 Cong. Rec. S17570-02, 1990 WL 168452 (Section by Section Analysis by the Federal Courts Study Committee, Oct. 27, 1990).  Before the addition of subsection (b), Congress issued no contrary directive; accordingly, based on the Eighth Circuit's reasoning contained in *Maverick Transportation*, this Court would have applied the discovery rule.  *Maverick Transportation,* 739 F.3d at 1154.

Twelve years later, Congress passed the Sarbanes-Oxley Act, including a statute of limitations provision codified as § 1658 (b), largely in reaction to the fact, in the Enron scandal, some claims were blocked by a shorter statute of limitations arising from a different source.  *See* 148 Cong. Rec. S7350-04, 2002 WL 1724193 (statement of Sen. Patrick Leahy, July 25, 2002).  Subsection (b) never uses the term "accrues" but rather the term "violation."  Thus, subsection (b)'s sole purpose was to ensure those wronged by the securities fraud of the mid-2000s would have an avenue of recovery, not to modify subsection (a).

The Office of the Law Revision Counsel of the House of Representatives

43

compiles the United States Code.  Typically, compilation decisions impart no legal significance to statutory language.  *See United States v. Welden,* 377 U.S. 95, 98 n.4 (1964); *Fourco Glass Co. v. Transmirra Prods. Corp.,* 353 U.S. 222, 227 (1957).  Thus, the legislative history here shows no intent to alter "catch-all" subsection (a) by the addition of subsection (b), pertaining exclusively to securities fraud.  Accordingly, the discovery rule necessarily applies to subsection (a).

Nonetheless, the District Court here relied on *Kost II,* which found that the inclusion of the discovery rule in subsection (b)(1) implicitly ruled out the use of the discovery rule in §1658(a).  But, §1658(b)(2) incorporates both a discovery rule and an *injury occurrence* rule.[3]  Under the District Court's rationale, the opposite result is also true:  the injury-occurrence rule in §1658(b) must mean Congress intended to apply the discovery rule to (a).

Thus, it cannot be reasonably advanced that the language in §1658(b)—

---

[3] Actually, §1658(b) has been interpreted by other courts not merely as separate from subsection (a), but as creating a statute of repose, not a statute of limitations, and one court has expressly distinguished between the two.  *See McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 930 (7th Cir. 2011) (noting that "[a] statute of repose is strong medicine, precluding as it does even meritorious suits because of delay for which the plaintiff is not responsible.  As opposed to a statute of limitations, which begins running upon the accrual of some claim and permits equitable exceptions, a statute of repose serves as an unyielding and absolute barrier to a cause of action, regardless of whether that cause of action has accrued.") (citations omitted).

44

which references both the discovery rule and the injury-occurrence rule—is helpful at all in determining which rule applies to §1658(a), and reliance on that subsection is at odds with the Eighth Circuit's interpretation of §1658.

### iii. *Gross is Inapposite.*

The reasoning in *Gross* simply is inappropriate here. *Gross v. Max*, 906 F.Supp.2d 802 (N.D. Ind. 2012). *Gross* involved the claims of a couple who failed to receive proper disclosures at the time of their purchase of a house—a lead paint warning—as required under law. The *Gross* plaintiffs obviously knew they did not receive the required disclosures—they knew what they were given at closing—but they failed to file suit until they **learned of the law.** *Id.* at 806, 813. The only concealment in *Gross* was the failure to apprise them of the law.

Further, *Gross* held that by including subsection (b) in §1658 Congress intended to eliminate the applicability of the discovery rule to subsection (a). This, however, completely ignores the inclusion of §1658(b)(2) in it analysis. Accordingly, the precise holding in *Gross* is inapplicable here. Further, *Gross* cited *Chang v. Baxter Healthcare Corp.*, 599 F.3d 718, 734 (7th Cir. 2010), but completely misstated *Chang's* holding. While *Chang* did contrast the use of the terms "accrues" and "arises," it reached exactly the opposite conclusion—the term "accrues" usually is associated with the discovery rule, while "arises" is most often associated with the occurrence rule: "The plaintiffs conceded that the suit

45

'accrued' in Taiwan but deny that it 'arose' there. They misunderstand those terms. A claim 'accrues' when the statute of limitations begins to run; a claim that could not have been discovered by the date on which it arose will not (in a jurisdiction with a discovery rule) accrue then. The terms 'arose' and 'accrued' are often conflated, because, other than in cases in which the discovery rule is invoked, usually the date on which the cause of action 'accrues' is also the date on which it 'arises.'" *Id.*

Finally, adopting the discovery rule would not abolish the statute of limitations; it would level the playing field – so that anyone who is injured under the Act has four years to sue once they learn of the injury. In fact, the *Smythe* case proves this point. Smythe did not sue until 9 years after learning of Chief Matzke's obtainment. *Smythe*, 2103 WL 2443849 at *2-4. Applying the discovery rule there would not have abolished the four-year statute of limitations; rather, it operated as it was supposed to and eliminated that stale claim.

*iv.   English vs. Parker Applied the Discovery Rule.*

The only case thus far outside of the District of Minnesota to consider when the statute of limitations accrues for the DPPA applied the discovery rule. In *English v. Parker*, the court rejected the occurrence rule, saying:

As the Court cannot tell what information was accessed in

46

2005, and **when Mark English was or should have become aware that his records were being accessed**, summary judgment is inappropriate on this point.

2011 WL 1842890 at *5 (M.D.Fla. May 16, 2011) (emphasis added).  The *English* court appears to have applied the discovery rule, and so should this Court.

### C. Public Policy Supports the Applicability of the Discovery Rule.

Public policy also supports the application of the discovery rule in this instance, because Appellees' actions were concealed and the identity of the violators is impossible to ascertain at this stage.

In *Amy v. City of Watertown*, the Supreme Court first recognized the applicability of the discovery rule to fraud cases, reasoning the "[c]oncealment of fraud prevents a party from knowing that he has been injured and has a cause of action.  He cannot take any steps to obtain redress."  130 U.S. 320, 324 (1889).  This reasoning, that fairness requires applying the discovery rule to fraud and concealment cases, has been applied consistently.  *See generally Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) ("The [discovery] rule arose in fraud cases as an exception to the general limitations rule that a cause of action accrues once a plaintiff has a complete and present cause of action.") (citations omitted)); *TRW*, 534 U.S. at 27 ("[W]here a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part, the bar of

47

the statute does not begin to run until the fraud is discovered.")

This reasoning was adopted by this Court. In *Kansas City, Mo. v. Fed. Pac. Elec. Co.*, this Court found "when there has been no negligence or laches on the part of a plaintiff in coming to the knowledge of the fraud which is the foundation of the suit, and when the fraud … is of *such character as to conceal itself*, the statute does not begin to run until the fraud is discovered by, or becomes known to, the party suing…." 310 F.2d 271, 275 (8th Cir. 1962) (citing *Bailey v. Glover*, 88 U.S. 342, 349 (1874) (emphasis added). Furthermore, "one who wrongfully conceals material facts and thereby prevents discovery of his wrong…is not permitted to assert the statute of limitations as a bar to an action against him…." *Id.* This holding was based on the premise that "wrongdoers who are successful in cloaking their unlawful activities with secrecy through cunning, deceptive and clandestine practices should not, when their machinations are discovered, be permitted to use the shield of the statute of limitations to bar redress by those whom they have victimized. *Id.* at 284.

It would be fundamentally unfair to penalize Plaintiff-McDonough for a concealed injury and she has no reason to know of the harm. The Supreme Court has been clear the application of an occurrence instead of discovery rule to such a case as this would simply be unjust. *Gabelli,* 133 S.Ct. at 1222 ("[C]ourts have developed the discovery rule, providing that the statute of limitations in fraud cases

48

should typically begin to run only when the injury is or reasonably could have been discovered.")

Thus, in cases involving concealed or latent injuries, the commencement of the limitations period does not begin until plaintiff discovers the existence of his cause of action. *Izaak Walton League of Am.*, 558 F.3d at 759; *Torres Ramirez v. Bemudez Garcia*, 898 F.2d 224, 229 (1st Cir. 1990); *see also Urie v. Thompson,* 337 U.S. 163, 169 (1949) (holding injuries that are "unknown and inherently unknowable" at the time they happen should be governed by discovery rule); *Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 734 (7th Cir. 2010); *Gross*, 2012 WL 5361747 at *7 (ruling discovery rule appropriate for statute of limitations, because in certain cases, injury is difficult to detect, because "immediate discovery is actively being prevented," or "would require technology and expertise well beyond what an ordinary citizen could possess.") As this was a concealed event, the discovery rule should apply.

### i. This Was a Concealed Event.

As in the above cases, the purpose of the discovery rule applies equally here. Appellees' activities here were unknown and concealed. Any DPPA plaintiff would have a difficult, if not impossible, time discovering they were injured at the time their private information was misappropriated. *See Clement v. United Homes, LLC*, 2012 WL 6720701 (E.D.N.Y. Dec. 27, 2012) (noting "where plaintiff would

49

reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called diligence-discovery rule of accrual applies." (*citing Kronisch v. U.S.*, 150 F.3d 112, 121 (2d. Cir. 1998)). McDonough cannot reasonably be expected to even have known she could obtain a DPS audit to learn of violations, particularly where DPS has affirmatively misrepresented to other parties the scope of the violations, refused citizens' specific request for information on the subject and refuses to name individual violators even when it provides an audit. (Ex. A at A47-61.)

Appellees' personnel never told McDonough they had obtained her Private Data. Rather, Appellees' personnel brazenly operated behind a systematic cloak of secrecy, yet now posit McDonough somehow should have imagined Appellees' illegal activities and penetrated their electronic walls. Sound public policy does not require citizens to constantly assume their government and its employees are violating their privacy rights. Indeed, the occurrence rule would overwhelm the DPS with constant requests by four million Minnesota drivers (and countless other drivers in other states) for audits of their lookups, without which those citizens would be losing claims for unknown violations every four years. Such cannot be the result Congress intended.

Are Minnesota citizens supposed to be obtaining regular audits of every known and unknown database in the universe that might show who looked at their

private data, searching for signs that the people who are supposed to protect them are instead spying on them?  No.  We count on the government to protect our privacy.  Any other results bring to mind this quote from George Orwell's <u>1984</u>: "There was of course no way of knowing whether you were being watched at any given moment.  How often, or on what system, the Thought Police plugged in on any individual wire was guesswork."  George Orwell, Nineteen Eighty-Four, 3-4 (Martin Secker & Warburg Ltd. 1949).

### ii.  There have been Affirmative Efforts to Conceal the Harm.

In cases where there have been affirmative efforts to conceal the harm or wrong, courts will apply the discovery rule.  In this matter, DPS – the entity charged with holding the data, affirmatively concealed the harm.  For instance, Dan Prozinski, a Minnesota citizen, had been denied access to his audit until he was able to provide an explanation to "substantiate [his] suspicion."  (Aff. of Dan Prozinski)  Mr. Prozinski had a series of communications with Joseph Newton, the general counsel of DPS, and Mr. Newton led Mr. Prozinski to believe that this information was simply not available.

### iii.  The Statute's Purposes Would be Served by the Discovery Rule.

The application of an injury-occurrence rule is at odds with the legislative history and the Supreme Court's own analysis of the DPPA.  As its very title

51

suggests, the DPPA is intended to protect privacy. It does more than simply prohibit the release of information like the FCRA, but rather addresses a "fundamental issue of privacy" and protects "*constitutional* rights." *See* 139 Cong. Rec. S15745-01, S15763 (Statement of Sen. Boxer) (emphasis added); *See also* 138 Cong. Rec. H1785-01 (Statement of Rep. Moran) (" Legislation should be passed to **protect basic privacy rights**…the privacy of individuals is being eroded because the Government all too easily disseminates private information about individuals.")

The Supreme Court has echoed the same sentiments, recognizing "the DPPA's purpose of protecting an individual's right to privacy in his or her motor vehicle records." *Maracich*, 133 S.Ct. at 2200. The Supreme Court understood the gravity of the data at issue in this case. *Id*. at 2202. While the information actually accessed by the attorneys in *Maracich* did not include health information, photos, or social security numbers, the mere fact that the system contained such items and that the Defendant had access to them was enough to convince the Court to strictly interpret the DPPA. *Id*. at 2196. Even the dissent noted that the exceptions "are designed to strike a critical balance between an individual's *fundamental right to privacy* and safety and the legitimate governmental and business needs for the information." *Id.* at 2213 (emphasis added).

The DPPA is directed at protecting basic privacy interests. To apply the

52

injury-occurrence rule would be a directive to all citizens to always be on the "look-out," and ignores the critical fact that violations of McDonough's rights were concealed from her.

## III. COMMISSIONERS SHOULD BE LIABLE UNDER THE DPPA FOR THEIR DISCLOSURE OF MCDONOUGH'S PRIVATE DATA.

The District Court dismissed McDonough's claims against Commissioners, holding that liability under the DPPA requires that Commissioners themselves acted with an impermissible purpose. (Order at A74). In so holding, the District Court essentially required that Commissioners have *actual knowledge* of the obtainer's *impermissible purpose* to be liable under the DPPA. That interpretation ignores the grammatical structure of §2721, Congressional intent surrounding the DPPA, the Supreme Court's *Maracich* opinion, and this Court's analysis of a similarly worded statute.

The District Court also failed to acknowledge Commissioners' responsibility under the DPPA to ascertain the purpose for which private information is being obtained. It instead reasoned that the DPPA does not impose liability on Commissioners who the District Court deemed to be indirectly facilitating someone else's access of information. (*Id.*) But this analysis disregards without explanation *Gordon v. Softech* and *Welch* that found otherwise. At bottom, Commissioners knew that the DPS system they set up never sought to ascertain the

53

purpose for which anyone was obtaining, using or disclosing individuals' personal information in that system, and this Court should hold that liability under this scenario can attach under the DPPA.

### A. Congress Intended for State Officials to Have Responsibilities Under the DPPA for Which They Would Be Accountable and Liable.

State officials were the very persons that were the focus of Congress' attention as being the source of improper disclosure in the first instance. Congress specifically addressed the duties of the state officials, and restricted their ability to release this information, in §2721, not only the first and the most definitive section of the DPPA, but the one in which the term "knowingly disclose" and its relation to the permissible purposes—not impermissible purposes—is best explained. In relevant part, subsection (a) provides that "[a] State department of motor vehicles, and **any officer, employee, or contractor thereof**, shall not **knowingly** disclose…personal information…except as provided in subsection (b) of this section…." §2721(a).

From §2721, which precedes and employs the same operative language as §2724, several basic principles emerge. First, no information can be released for any reason **except** for the uses set for in §2721(b). Second, this prohibition applies to the state officials. And third, "knowingly" can only be read to modify the act of disclosing, and not "except as provided in subsection (b)."

54

The interpretation that "knowingly" modifies only "disclose" is the only one that reflects Congress's intent. The legislative history defined the purpose of the legislation to "safeguard[] the privacy of drivers...by prohibiting release of personal information-including a person's name and address—to anyone without a specific business-related reason for obtaining the information." 103 Cong. Rec. E2747, Statement of Rep. Moran, Nov. 3, 1993. Representative Moran also stated that the DPPA would "restrict access to all those without a legitimate purpose." *Id*. The Senate sponsors restated the same purpose in that government officials are prohibited from releasing "personal information to anyone without a specific business related or government related reason..." 103 Cong. Rec. S15765, Statement of Sen. Robb, Nov. 16, 1993.

Nowhere in the DPPA's legislative history does it indicate that the evil to be remedied was the release of information to "anyone" when the state official was aware of a bad motive or impermissible purpose, as the District Court has interpreted the DPPA here. Rather, the concern was with personal information being provided without state protection:

> It is easy for anyone anywhere to access information as personal as
> your address and phone number...and the chief agent giving out this
> kind of information is the very government that is supposed to protect
> its citizens...Yet the laws of some States do just that by routinely providing
> this identifying information to all who request it."

*Id*., Statement of Sen. Biden.

Appellate Case: 14-1754    Page: 66    Date Filed: 05/28/2014 Entry ID: 4158496

The problem Congress sought to remedy was the knowing release of information by state officials who failed to ascertain the purpose for others obtaining it—the problem being addressed was NOT state officials' complicity in the bad motives of the obtainers. And to that end, Congress emphasized and noted four events that demonstrated the extreme harm that can arise because of a state actor's release of personal information without determining the purpose for which the recipient is seeking such information:

(i)     the murder of actress Rebecca Schaeffer, who was stalked by an "admirer" who obtained her address from the California DMV;

(ii)    Iowa teenagers who obtained home addresses of wealthy car owners from the Iowa DMV;

(iii)   the Arizona woman who was murdered by a man who obtained her address from the DMV; and

(iv)    a man who sent threatening letters to five women, and in whose car the police found a book titled "You Can Find Anyone" that indicated asking the state DMV was helpful.

See 103 Cong. Rec. S15762, Statement of Sen. Boxer, Nov. 16, 1993. In none of these instances was there any suggestion that the state officer releasing the information knew that the obtainer intended to misuse the information. Yet that is the limitation on the DPPA that the District Court adopted below. Only a severely restricted reading, and complete disregard of the DPPA's legislative history, can give rise to this interpretation.

56

57

**B. Both Statutory Construction of §2721, as Well as Directly Relevant DPPA Case Law, Support this Court's Interpretation That "Knowingly" Modifies Only Disclosure.**

The language of §2721, when read with §2724, makes clear that "knowingly disclose" draws the distinction between inadvertent disclosures by state officials versus intentional (knowing) disclosures. Contrary to the District Court's decision, §2721 of the DPPA cannot reasonably be read to apply the term "knowingly" to the purpose element.[4] The entire grammatical structure of §2721 would have to be completely reworded in order to make this term applicable to the purpose element (subsection (b) of 2721), and even if it could, the plainest meaning of the modifying adverb would be to apply it only to the verb "disclose."

In *Pichler v. UNITE*, another district court addressed this same issue. 228 F.R.D. 230, 241-42 (E.D. Pa. 2005). *Pichler* focused on the grammatical structure of the liability phrase, holding that the application of knowingly to both the act and purpose requirements required a strained interpretation of the language Congress used:

> The structure of § 2724(a) and the location of the adverb "knowingly" within that structure suggest that Congress intended to limit the reach of the knowledge requirement. The relevant portion of § 2724(a) includes three clauses: (1) "obtain, discloses or uses personal information" (the "first clause"); (2) "from a motor vehicle record"

---

[4] Although Commissioners focus on §2724 of the DPPA, the brevity of that civil liability section cannot be reasonably interpreted without reference to the far more detailed and first section of the DPPA, §2721.

58

(the "second clause"); and (3) "for a purpose not permitted" (the "third clause").  The first clause specifies the acts…the DPPA prohibits, and the second clause modifies the first clause by limiting the relevant kind of "personal information" to information "from a motor vehicle record."  … The third clause, on the other hand, creates an independent "purpose" element, representing the second half of a plaintiff's burden of proof on DPPA liability.

*Id*. at 241-42.  Based on this linguistic analysis, the court held that "knowingly" modifies only the act element.  *Pichler* also addresses the problem with Commissioners' interpretation in this case:

"[A]nyone could claim that he did not 'know' his purpose to be impermissible until a court interpreted the DPPA to proscribe that purpose.  Even after such a ruling, a defendant could manufacture a slightly different purpose for his conduct and then clam ignorance of whether the DPPA prohibited the new purpose.  A plaintiff could recover only if the defendant repeatedly violated her privacy and lacked sufficient creativity to conjure up some conceivable purpose that no court had yet considered."

*Id.*

The Third Circuit affirmed, adopting the linguistic analysis and significantly expanding the bases for this statutory construction.  *Pichler v. UNITE*, 542 F.2d 380 (3d Cir. 2008).  It held that §2724 consists of two elements—the act and purpose elements—and the term "knowingly" modifies only the act element.  *Id.*  It reasoned that the logical structure of the DPPA's criminal and civil liability sections required that the "knowingly" apply only to the act, not to the purpose element of §2724.  The Court also observed that in analogous statutes, where

59

criminal liability requires a knowing violation, civil liability is premised only on a knowing act, rather than a knowing purpose.  *Id.*

The Third Circuit also contrasted the language applying the standard for actual/liquidated damages under 2724(b)(1) versus that for punitive damages under 2724(b)(2).  Punitive damages require only willful or reckless disregard of the law, a standard lower than that of knowingly disclosing while knowing that disclosure was for a purpose not permitted under the Act.  Providing for punitive damages on a lesser standard than that required for actual/liquidated damages is so unusual that the Court refused to read it into the DPPA unless Congress clearly stated that intent.  *Id.* ("knowingly"  could not possibly modify the purpose, or that interpretation would "mak[e] every single violation one for which punitive damages would apply.")*; see also Senne v. Village of Pallatine, Illinois,* 695 F.3d 597 (7th Cir. 2012); *Best v. Berard*, 837 F. Supp. 2d 933 (N.D. Ill. 2011) ("The Court agrees with these cases and concludes that the DPPA requires only a deliberate act constituting disclosure, not knowledge that the disclosure was legally forbidden.  That is the standard definition of 'knowing' conduct…and there is no basis to think that Congress established a stricter standard in the DPPA.") (citations omitted); *Rios v. Direct Mail Express, Inc.,* 435 F.Supp.2d 1199, 1205 (S.D. Fla. 2006) ("the term 'knowingly' only modifies the phrase 'obtains, discloses, or uses personal information.'  It does not modify the phrase 'for a purpose not permitted

60

under this Chapter.'")

Appellate Case: 14-1754    Page: 72    Date Filed: 05/28/2014 Entry ID: 4158496

**C.    This Court Has  Interpreted "Knowingly" to Modify Only the
Act Requirement (Not the Purpose Requirement) in a
Similarly Worded Statute.**

This Court, in *Jones v. United States,* interpreted an analogous statute, and

found that "knowingly" applied only to the act requirement.[5]  *See Jones v. United*

*States*, 97 F.3d 1121, 1124 (8th Cir. 1996).   The tax statute in *Jones* provided:

> If any officer or employee of the United States **knowingly**, or by reason of
> negligence, inspects or **discloses** any return or **return information** with
> respect to a taxpayer **in violation of any provision of section 6103**, such
> taxpayer may bring a civil action for damages against the United States in a
> district court of the United States.  *Id.* (emphasis added).

*Id.*  The *Jones* district court observed that "the common and ordinary meaning of

the word 'knowingly' is merely that the actor must be aware of what he or she is

doing and does not act because of some mistake or accident."  *Jones v. United*

*States*, 898 F. Supp. 1360, 1376, n.16 (D. Neb. 1995) (citations omitted).  The

court reasoned—**using exactly the same logic the *Pichler* court would employ a**

**decade later**—that because §7431 establishes willfulness as the standard for

punitive damages, Congress could not have intended to set a higher standard of

"knowing violation" for compensatory damages, and therefore the adverb

"knowingly" could not modify the purpose element.  *Id.*  This Court, while

---

[5] The analogy of this civil liability language to §2724(a) of the DPPA is that both
have an <u>act</u> element (*compare* "obtains, discloses, or uses" of 2724 *with* "inspects
or discloses" of 7431) and a <u>purpose</u> element (*compare* "for a purpose not
permitted under this chapter" *with* "in violation of section 6103") and use the
adverb "knowingly."

62

reversing on other grounds, affirmed the finding that the knowledge (or by reason of negligence) requirement only modified the disclosure. *Jones*, 97 F.3d at 1124.

This Court should follow its same reasoning in *Jones* and similarly hold that, "knowingly" modifies only the act element of §2724, and reverse the District Court's dismissal of McDonough's action against Commissioners, which was premised on McDonough on having to meet an incorrect, expanded burden standard.

### D. Regardless of the "Knowingly" Issue, Commissioners Are Liable Under the DPPA, Because They Knew the System They Established Never Required Ascertainment of Purpose.

Regardless of the statutory construction issue relating to the word "knowingly," Commissioners knew that the system they set up required no ascertainment of purpose and this should be a basis for liability under the DPPA.

The District Court held that Commissioners could not be liable under the DPPA for mismanagement of records or negligent conduct. (Order at 10). Commissioners argued and the District Court accepted that McDonough was trying to impose a strict liability standard on Commissioners. But McDonough makes no such argument. Rather, McDonough argues liability exists under the DPPA for the Commissioners' failure to ascertain a permissible purpose **before** releasing information.

63

*i. Pichler* and *Gordon Impose a Duty on Commissioners to Ascertain Purpose.*

Other courts have considered this issue and agree that the discloser (here, Commissioners) has a responsibility under the DPPA to ascertain the permissible purpose for information is sought. The two courts with the most in-depth analysis of the DPPA—*Pichler* and *Gordon*—both hold that between the discloser and the obtainer, the discloser bears the duty of ascertaining a permissible purpose for the obtainment. Under *Pichler*, a good-faith but mistaken belief that an obtainer's purpose is permissible is no defense. *Pichler,* 228 F.R.D. 230, 241-242. *Gordon* holds that the duty is to exercise reasonable care in determining whether the user actually had a permissible purpose, even where a facially permissible reason had been stated by the obtainer. *Gordon v. Softech Intern., Inc.*, 726 F.3d 42, 58 (2nd Cir. 2013).

The District Court's ruling provides carte blanche for the Commissioners to disclose Private Data to anyone based on the *status* of the entity, instead of on the *purpose* of the recipient. Subsection (b)(1) has two requirements – an entity (law enforcement, etc.) and a purpose ("for carrying out its functions"). Here, a disclosure based on the category of recipient, without ascertaining a specific purpose or *assuming* proper use is inappropriate.

The *Gordon* court specifically analyzed this issue. The discloser of the

64

information in *Gordon*, Arcanum, tried to defend the disclosure based on b(6)

because that was the box checked by obtainer of the information. The b(6)

exception permits disclosure to "an insurer or self-insured entity in connection with

claims investigation activities, antifraud activities, rating or underwriting." The

obtainer, even assuming he satisfied the purpose requirement, was *not* an insurer or

self-insured. Thus, the Court ruled against Arcanum, finding that the disclosure

did not meet *both* the entity *and* purpose requirement.[6] This Court should also find

that disclosure based simply on the category of the obtainer, without any

ascertainment of purpose, violates the DPPA.

> ii. *Even <u>Roth's</u> Rationale Requires the Commissioners to Ascertain the Obtainer's Purpose.*

In *Roth v. Guzman,* the Sixth Circuit distinguished the holdings in *Pichler*

and *Welch*,[7] using much the same <u>rationale</u>—that the discloser has some duty in

---

[6] *Gordon* also concluded that constructive knowledge is sufficient. 726 F. 3d at 54. The problem in *Gordon* arose with how Arcanum disclosed the information. "Although Arcanum did ask Leifer to represent that he was seeking the information for a lawful purpose, a reasonable jury could find that Arcanum failed to use reasonable care, and that, had it been reasonably diligent, Arcanum would have discovered that Leifer was seeking the information for an improper purpose." *Id.* at 58.

[7] *Welch v. Theoridides-Bustle*, No. 4:09cv302-RH/WCS, 2010 WL 2652400, at *2 (N.D. Fla. Jul. 1, 2010) (denying summary judgment and holding state officials liable both for initial AND downstream disclosure unless they understood both that the initial obtainer would hold the information and disclose it only for a permissible purpose; **and** that the downstream discloser would be acting on behalf of the state officials in carrying out its functions).

Appellate Case: 14-1754    Page: 76    Date Filed: 05/28/2014 Entry ID: 4158496

ascertaining the permissible purpose of the obtainer—but reaching a different result, largely due to the specter of strict liability. Significantly, *Roth* held only that qualified immunity barred recovery under the facts of that case. *Id.* at 617.

But even the dicta in *Roth* cannot be applied here without carefully considering the significant factual differences. *Roth* related to the duty of state officials where misuse was remote and indirect, rather than immediate and based on the state officials' direct disclosure of information. In fact, the *Roth* plaintiffs conceded the officials there had disclosed the data "*for an explicitly permissible purpose*" under 18 U.S.C. §2721(b)(3). *Id.* at 611 (italics the court's). The problem arose in *Roth* not upon the initial disclosure, but upon the re-disclosure by the initial obtainer without investigation into the purpose of the second recipient's obtainment. That is, the *Roth* Plaintiffs claimed that the second user impermissibly obtained and used the information—and that the second disclosure was improper, and that the state officials should have foreseen this improper, subsequent usage. So *Roth*'s strict liability discussion is inapplicable here.[8]

McDonough presents a different situation. McDonough alleges that Commissioners should have ascertained the permissible lawful purpose of the

---

[8] *Gordon* analyzed *Roth*, and distinguished it because it did not deal with a reseller; but cited with approval the *Roth* dissent's belief that "the DPPA compels the conclusion that the Act imposes…a duty of reasonable inquiry." *Gordon*, 726 F.3d at 56, quoting *Roth,* 650 F.3d at 619 (Clay, J., dissenting).

66

person to whom they disclosed her information initially; and assuming Commissioners did that, they would be "off the hook." But Commissioners did not do that; they made zero attempts to ascertain *any purpose*.

This case is not about a *permissible* initial disclosure, like in *Roth*. This case is about disclosures to individuals based not on any ascertainment of purpose, but merely upon status as *potentially* eligible recipients. Thus, this Court should read *Roth* for what it is—not holding state officials liable when the inappropriate obtainment is remote and distant from their conduct. This Court should instead reason that a DPPA violation occurs whenever state officials disclose information based solely on the obtainer's status without ascertaining that the obtainer's purpose is permitted under the DPPA.[9]

## CONCLUSION

Based upon the foregoing arguments, McDonough respectfully requests this Court reverse the District Court's granting of the Appellees' Motions to Dismiss, and remand for further proceedings.

---

[9] This disclosure is made through the issuance of a password, and if obtainment is pursuant to a legitimate purpose, no violation occurs for the same reason that no violation occurs when an obtainer stockpiles the information for later use or sale. *See Gracyk v. West Publ. Co*, 660 F.3d 275 (7th Cir. 2011); *Cook v. ACS*, 663 F.3d 989 (8th Cir. 2011) (noting that the Department of Motor Vehicles does however have the duty of reasonable inquiry before releasing the information).

Appellate Case: 14-1754    Page: 78    Date Filed: 05/28/2014 Entry ID: 4158496

Dated:  May 27, 2014               **SAPIENTIA LAW GROUP**

s/ Jonathan A. Strauss
  Jonathan A. Strauss (#0279602)
  Sonia Miller-Van Oort, #278087
  Lorenz F. Fett (#196769)
  Kenn H. Fukuda, #389301
  12 South Sixth Street, Suite 1242
  Minneapolis, MN 55402
  Telephone: 612.756.7100
  Email: jons@sapientialaw.com
  Email: soniamv@sapientialaw.com
  Email: larryf@sapientialaw.com
  Email: kennf@sapientialaw.com

  *Attorneys for Plaintiff-Appellant*

68

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on, I electronically filed the foregoing with the Clerk

of Court for the United States Court of Appeals for the Eighth Circuit by using the

CM/ECF system. I certify that all participants in the case are registered CM/ECF

users and that service will be accomplished by the CM/ECF system.

Dated:  May 27, 2014        **SAPIENTIA LAW GROUP, PLLC**

s/Kenn H. Fukuda
Jonathan A. Strauss (#0279602)
Sonia Miller-Van Oort, #278087
Lorenz F. Fett (#196769)
Kenn H. Fukuda, #389301
12 South Sixth Street, Suite 1242
Minneapolis, MN 55402
Telephone: 612.756.7100
Email: jons@sapientialaw.com
Email: soniamv@sapientialaw.com
Email: larryf@sapientialaw.com
Email: kennf@sapientialaw.com

*Attorneys for Plaintiff-Appellant*

69

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(1)(7)(C) and 8th Cir. L.R. 28A(C), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7). The brief was prepared using Microsoft Office 2010, which reports that the brief contains 13,776  words.  The brief was scanned for viruses and is free of viruses.

Dated:  May 27, 2014                     SAPIENTIA LAW GROUP, PLLC

                                         s/Kenn H. Fukuda
                                         Jonathan A. Strauss (#0279602)
                                         Sonia Miller-Van Oort, #278087
                                         Lorenz F. Fett (#196769)
                                         Kenn H. Fukuda, #389301
                                         12 South Sixth Street, Suite 1242
                                         Minneapolis, MN 55402
                                         Telephone: 612.756.7100
                                         Email: jons@sapientialaw.com
                                         Email: soniamv@sapientialaw.com
                                         Email: larryf@sapientialaw.com
                                         Email: kennf@sapientialaw.com

                                         *Attorneys for Plaintiff-Appellant*

Appellate Case: 14-1754     Page: 81     Date Filed: 05/28/2014 Entry ID: 4158496